This is a recording of a meeting between the Roxane Laboratories, Inc. and the University of California, San Diego, California, on September 16, 2020.  This is a recording of a meeting between the Roxane Laboratories, Inc. and the University of California, San Diego, California, on September 16, 2020. Okay, the next argued case is number 17, 2078, Accorda Therapeutics, Inc. v. Roxane Laboratories, Inc. Mr. Wexler. May it please the Court, Bruce Wexler for Accorda. Before Accorda's invention, the FDA had never approved any drug therapy to treat the devastating problem of walking impairment in MS patients. Accorda invented a method using a singular, low, 10-milligram-bid dose of 4-AP without any upward titration to improve MS patient walking and broke from the prior art which consistently used titration as the district court found because the mechanism of action of 4-AP that offered the therapeutic hope was the same mechanism that created the toxicity. Am I wrong? SCHWIDT didn't use titration, did it? SCHWIDT was a very short study, not the long-term study like required by the claims. It used 17.5, which was higher than the claims at issue, and it was exploring the variation in PK values in that short study. It was not a study looking at efficacy. All the studies, as the district court found— I thought it had a finding in it that there was gait improvement at 17.5 twice a day. To be precise, the finding was that, and again, it wasn't a primary endpoint study looking for efficacy. It was an observational outcome. The finding was that when they gave 17.5, which was higher than the claims, there was a variation in blood serum concentration, and the finding was that at least 60 nanograms per milliliter was necessary to see any subjective reporting of improvement in the gait, which is higher than the claim. For that reason, the district court found that the prior art consistently taught titration as a method of using this to try to achieve efficacy. So Van Diemen, Polman, Alon, all the prior art that used 4-AP escalated the dosing upward in Goodman because the potassium channel blocking mechanism was the same mechanism that created the toxicity. So you acclimate the patient in a low dose. You rise the dose up, seeking the toxicity level, the highest tolerable dose, and you hope to see some efficacy. But your own witnesses, Cohen and Goodman, seem to see significance in the 10 milligram or 20 milligram a day figure. And I think that goes to the heart of the district court's clear on Goodman. There was no such testimony to that effect in the record, and I'd like to focus – on the prior art, Goodman's reference, and saying that it would direct you to at least be interested in the 20 milligram a day, 10 milligram twice a day dosage, right? First of all, the testimony was that the 20 to 40 would be a subject for future testing of interest, and it expressly did not say that this is where the district court made its fundamental clear error of fact on page 70 of the appendix. It did not say that 20 to 40 showed efficacy, and that's extremely important because it unravels the district court's analysis of Goodman at 72 to 73 that actually contradicts the court's earlier findings on Goodman, contradicts the facts, the testimony of both experts, and contradicts the court's findings about the MFS 201 study in which – Yeah, but one of the things they seem to be saying in the testimony is that it doesn't show efficacy. They seem to be talking about a standard for FDA approval rather than what someone would engage in inquiry on with respect to a patent. And they seem to agree that the 10 milligram dose is something that you would pay attention to. Do you at least agree with that? No, Your Honor, and I'm sorry, with all due respect, I do not agree that it's an FDA standard they were talking about, and I think it's really important for this appeal. No, no, but they did say the 10 milligram dose is something that we would pay attention to for future studies. No, there is no such testimony. There was testimony, and we can go to the testimony. It's Goodman's testimony at 792 to 793, and Goodman's testimony at – Well, look at 628 is Colin, and he says it gave us a hypothesis to test that between somewhere in the range of 10 to 20 milligrams that we should test that range for walking speed in MS. And then Goodman on 845 says something similar. He says if there were to be future studies, the dose range for future studies would be 20 to 40 milligrams a day. And the answer is at a range, yes. And that's precisely the clear error because the witnesses were testifying that 20 to 40 milligrams as an escalating dosing regimen would be of interest for future study. That is not the KSR standard that requires predictability for the claimed combination, and this is where the fundamental error of the district court that unraveled. I think if your honors look at page 72, the district court didn't rely on 20 to 40 as a future study standing alone. At page 72, the district court found, quote, the 20 to 40 milligram range is, quote, indicating that patients taking these dosages of 4-AP demonstrated a greater response to treatment than did patients taking placebo. That is a scientific standard, not an FDA standard. In the findings of fact, the district court at page 32 found that the dose response curve did not compare to placebo. The district court found at page 30 that only the aggregated dosing regimen, the escalating dosing regimen, had significance, not the individual doses. That's at appendix 30, note 11. Both sides' experts, Dr. Peralta and Goodman, who the court found credible, testified at A799 to 800 and A451 that you could not draw a conclusion about placebo comparison from the dose response curve. The district court mistakenly assumed, at page 792 to 793 and nowhere else, that the dose response curve implied efficacy compared to placebo in the MS art, where you have interpatient variability, patient variability on a daily basis, and great placebo effect, as the court found at pages 5 to 6. What did the court cite? Let's really look at that carefully. The court cited attorney argument by the defendant, 1116. That's not evidence. The court cited the testimony by Goodman that Your Honor pointed to, which talked about the dose response as an escalating regimen, because remember the prior consistently used escalation for future study, and he specifically said it is not whether a response represents significant effect over placebo, and I commend Your Honors to look at the testimony. In footnotes 34 and 35, the court cites more argument by defendant's counsel. A1048 cites Goodman testimony, exactly as Your Honor pointed out, that 20 to 40 would be of interest, and remember Dr. Goodman is working with a quarter, of interest for future testing as an escalating range. Without that fundamentally erroneous premise that the dose response curve was making a claim for individual doses compared to placebo, the court could not go on to find at page 73 that, quote, patients walking responded to 4-AP dose at a 10 milligram level. That 10 milligram would be among the finite group of doses reasonably expected to improve walking MS patients. And I also would like to point Your Honors to, if I could, the court's finding of pages 30 to 31, the court found, end pages 19, the court found that in the 201 study, the results of which were disclosed in Goodman, the placebo group did better than the dosing group at 10 milligrams in early weeks. It is impossible to reconcile the fact that there's no placebo comparison in the dose response curve, that the placebo did better at 10 milligrams, and that the only testimony was a subject of future testing. At 72 to 73, that got converted erroneously into an assumption that Goodman is teaching efficacy of 10, and that created a big problem in terms of now it all seems like hindsight and we look back and it seems simple. But even if 20 to 40 milligram were subject to future testing, even if that were correct, which we submit is clearly erroneous, that doesn't satisfy KSR. KSR is not about plausibility of a future study, especially by the people who are bound up with the invention itself. It's about predictability of the combination. As a thought experiment, imagine if we had filed our patent right after Goodman, that we'd be in this court right now being accused of claiming 10 milligrams when the placebo did better than 10, with no basis to claim 10 efficacy. We submit that only after we did the 202 study, which was not in the prior art, and Dr. Cohen did a post hoc responder analysis of his 202 data, that he made the surprising discovery that 10 worked and that you could abandon escalation that made it so challenging to use this in the art. And that takes me, your honors, to the objective and issue which I'd like to also talk about, which is that the district court in this case found, quote, considerable, unquote, commercial success, appendix 80. A nexus to the accord of patents, page 83. Quote, convincing, unquote, evidence of a long felt but unmet need, page 87. Is it your understanding that 271E would protect not just lab research of a pharmaceutical company from infringement under Supreme Court decision integra, but also clinical studies? Absolutely, that's what it's designed to do. And I would point, your honors, for example, to the Merck case. In Merck, the reference, first of all, we were dealing with an FDA exclusivity for a drug that had been previously approved. 4-AP was a 102-year-old drug that had never been approved. But in Merck, the Lunar News article was what the doctor, it was the key prior art, it was virtually anticipatory. And the court said they couldn't do anything with that prior art because they had a regulatory exclusivity, Merck, that blocked even access to the compound. And they said they could only exhort Merck to go back and do the work. We have no regulatory exclusivity. We have no evidence that, in fact, they blocked. An independent pharmaceutical company with no rights to the Elan patent may be able to conduct all kinds of research, including clinical studies. But the one thing it knows, unless it has a really, really strong view that the Elan patent is invalid, is that if it wins the race to an actual well-functioning product, that it's going to have to share any revenues with, and it can then go to Elan or Accorda and say, you got nothing, we got something, this is a great recipe for making a deal, and then they're going to negotiate about how to share the revenues. So unlike Accorda, which is thinking, we get it all if we win the race to a product that actually works for walking and MS patients. Well, Your Honor, no. Lower incentive to conduct the research, no? No, because Accorda in this case actually went to Elan after Elan abandoned 4-AP when its major clinical trial failed. That's at Appendix 65. Let me see if I can make a point that seems to be so blindingly obvious that I'm missing how you can fail to agree with it. Accorda, forget about the difference between Elan and Accorda. Accorda has a blocking patent that blocks actual marketing of a successful drug that somebody, within its terms. So you're referring to the patent in suit, Accorda's patent in suit now? This blocking patent comes up as secondary considerations for deciding whether the, let's assume, Accorda on the art has done something non-obvious and patentable, right? And it wants to get FDA approval. Now look back to the time before Accorda figured that out and think, would somebody else have figured that out? The blocking patent argument is nobody else really would have tried because there's no money in it, because it wouldn't have been able to market anything. That's strictly speaking false as an absolute proposition. But as a proposition that says the incentive to do that is significantly lower because it would have to share the revenue. First it would have to get agreement from the blocking patent owner and then share the revenue. That is self-evidently true, is it not? Well, Your Honor, no, because in this case we're making, we made a billion dollars on a drug that we licensed from Elan under what the alleged blocking patent is. The very commercial success the court found arose out of Elan's failure in our license. But the point is that you held the Elan patent. But the question is whether someone who was blocked by the Elan patent in the real world would have gone in and spent the money to develop a drug. But the answer is yes, because we did just that. The Elan patent preceded our existence. The failure occurred and then Dr. Cohen approached Elan. If somebody else had done this research and come up with what Accorda did before Accorda and gone and gotten a patent on it, could it have marketed the product without getting permission from whoever had rights to the Elan patent? If the company either had a product that didn't infringe, because remember the Elan patent's not blocking all uses, or took a license, or showed that the Elan patent was problematic like the defendants had tried to do. Okay, so the short answer is you agree that this is a problem implicit in what you did not say. You agree that a rival would have to get permission or defeat the Elan patent and to get permission it's probably going to have to pay something.  It is looking at a potential revenue stream that is lower than the potential revenue stream that Accorda is looking at because it has to share its revenue stream. You don't. Right, we did when we got the Elan patent. Okay, so there is a case-specific or industry or product-specific analysis that's required to figure out whether the incentive, the diminished incentive, I think self-evidently diminished incentive, still leaves enough incentive for somebody seeing the market opening to go and do it. I would say yes, if that's the standard, but that didn't happen in this case. The court just simply discounted overwhelming commercial success and nexus on the mere existence of the patent, which we would submit conflicts with the Merck VR spirit precedent. In the real world, without a license to a blocking patent, do people go in and develop drugs and go through the clinical trials of the FDA? Yes, people develop drugs all the time, there's litigation all the time, but remember in this case, the evidence of record... I'm asking you, on the assumption that there's a blocking patent, that they agree would block them, do, as a matter of practice, without a license to the blocking patent, do people go in and develop an alternative that would otherwise be blocked by the patent, spend the money for the clinical trials and the FDA approval? They may, if they thought they had a basis to go around the patent. No, no, you're making an assumption that I'm excluding with my hypothetical. I'm saying unless, if the patent is a blocking patent, if they are convinced that it would block them, people don't go and develop drugs that are blocked by a patent, right? Unless they can get a license on it. If they can get a license or if the incentive is great enough. This is not a blocking patent. I think we're going off on a curious path. My impression was that as a controlled release, as the formulation that's being used, the Elan patent does go through the FDA, the Hatch-Waxman procedures, just like the other patents, and that it's no more of an obstacle than the patents on the product. I would agree, Your Honor, and I see I'm in my rebuttal time. Okay, let's have your rebuttal time. Let's hear from Mr. Klein. And maybe before we start the clock, to really clarify my understanding of this blocking situation, every patent on a product which goes through the FDA system and ends up in these Hatch-Waxman procedures is a blocking patent, which is where Hatch-Waxman came from. Why is the Elan patent any different? Okay, first, may it please the Court, I'm happy to address that answer. That question, the Elan patent in this case, there's no dispute that the Elan patent covers any use of the Accorda patent. But is the formulation, is it not the controlled release formulation, which is approved, or not? It's a method patent to using the controlled release formulation to treat MS patients. Well, Hatch-Waxman doesn't draw those distinctions, I don't believe. You're saying it's not involved in the Hatch-Waxman proceeding? No, that's not what I'm saying. It was decided by the district judge. Yeah, no, I'm not saying it wouldn't be involved in a Hatch-Waxman proceeding. What I'm saying is patents can be involved in a Hatch-Waxman proceeding that don't necessarily constitute blocking patents. So you could have a patent that maybe addresses a particular type of formulation that a drug developer or a generic pharmaceutical company could design around. Here, you can't design around the Elan patent if you want to practice the Accorda patents. It covers any use of the Accorda patents. And so if a skilled artisan in 2004 wanted to develop a 10-milligram sustainable— Well, that's a different question, isn't it? If you can design around it, it's not blocking. Yes, correct. If you can design around an earlier patent, then it wouldn't block. Here, you can't design around it, and you couldn't get a— since 1998 and the priority date is 2004. And so given that Accorda was developing the product, if you're a third party, it's highly unlikely you're going to go to Accorda and say, hey, can I develop the product, too, and they're going to say yes. Okay, I took us away from the merits. Let's start the clock. Oh, okay. Okay, proceed. All right, I'll start. May it please the Court. Charles Klein for the defendants. I'm happy to answer any additional questions on the blocking patent before I move to another topic. Well, secondary considerations being secondary, maybe we can talk about the prior art. Okay. So what we were discussing, I think, in that part of our earlier discussion, really focused on exactly what the Goodman presentations showed, exactly what Goodman testified to, and whether that really supported a legally sufficient concept of reason to try this, to use that term, with a sufficient expectation of success as measured here by a walking benefit. So can you focus on those very specific things? Absolutely. Let me start with the Goodman poster itself. The Goodman poster, by the way, is almost illegible in the joint appendix. I don't know whose responsibility that is. We can submit a ‑‑ there was a very small portion, and I think in the joint appendix, if you look at 6502 through 6504, it becomes more legible. We tried to blow up certain parts of it. Well, I think if you could submit a clearer copy of it, that would be helpful. We would be happy to. And perhaps what we'll do is blow up each section as a separate page. Just be careful about the blowing up. Some of these numbers are very small, and they get worse when they get blown up. I know. This was a difficult exhibit. But a couple of things are clear. There's testimony about what I'm about to read, but this is what the document itself says. The objectives, I'm on appendix 6502. Left column, right column. Bottom left‑hand column. There are two objectives. The first one is to obtain safety of multiple doses. This is a dose ranging study, as the title of the document makes clear. And the second is to obtain evidence of efficacy and dose response. So those are the objectives of the study. And then if you go to 6503, there are conclusions. And this is obviously what was conveyed to a skilled artisan before the priority date. Safety profile consistent with previous experience. Two, significant benefit on timed walking. If you go to the fourth, evidence of dose response in 20 to 40 milligram per day range. Evidence of a dose response. You're right, it's the fifth one. My apologies. So this is ample support for Chief Judge Stark's conclusion that the Goodman references and the prior art as a whole convey that a POSA would consider 10 milligrams twice daily to be among the finite group of sustained release 4AP that could reasonably be expected to improve walking in MS patients. Not the only criticism that I think ACORDA has, but rather central to its criticism, is the assertion that without testing a placebo, this can't show what it needs to show to support the conclusion. Can you address yourself to that? Yeah, so the district court found, and there was some testimony on that, where I cross-examined Dr. Goodman and I asked him, did you intend to mislead the public? Did you intend to hide any information about these studies? No, I didn't. And Judge Stark inferred from that testimony that to the extent that ACORDA and Dr. Goodman did not believe that there was a dose response because of a placebo issue, they wouldn't have said evidence of a dose response in the 20 to 40 milligram per day range. I mean, that's what they're reporting to those skilled in the art, that they found evidence of a dose response. This isn't a full clinical trial report. This is a poster that's supposed to summarize the results of the study, and they are teaching those skilled in the art that they found evidence of a dose response, including the 20 per day range, which is the 10 milligram twice daily dose claimed in the patent. Oh, one other thing that I don't believe is in the briefs, but it's in the record, and it was discussed at trial, is it's appendix 7993. ACORDA itself had a press release on its website dated December 3rd, 2003, where they said that participants in its MS studies had demonstrated improved walking ability. By the way, you should be aware that the fact that you have an appendix number on your page doesn't mean it's actually in this. You number all kinds of things, right? Oh, well, if you want, we can submit this when we submit the blowup of the poster. I also wanted to clarify a statement that counsel made about the Schwid reference. And there were, number one, there were assertions in the brief that Schwid actually teaches away from the claimed invention. It teaches towards the claimed invention. The conclusion is that 4-AP sustained release improved motor function in MS patients. And then the quantitative outcomes used in this study permit more sensitive evaluation of the symptomatic treatments for MS. And then at the end, they say future studies will need to examine long-term efficacy, tolerability, and refined dosing regimens to optimize delivery. And there was a reference earlier or an assertion that Schwid said, and I wrote this down, that 60 nanogram per milliliter serum concentration is necessary for efficacy. That is not at all what Schwid said. Schwid said that 9 of 10 patients had their walking improved. Six had mean serum greater than 60 nanograms per milliliter. And all of the patients were given the 17.5 twice a day, right? Correct. Stable, not titrated. Stable, not titrated. So it's still, at least by percentage, significantly higher than 10 milligrams. But it is at least stable and non-titrated and some walking benefit. Yes. And of course, it's almost in the middle of the range that the Goodman references teach, which is 10 to 20 milligrams twice daily. So it's very consistent with what the Goodman references taught. With regard to the serum point, though, Schwid actually references another article by Beaver, which, and I'm referring to the Schwid on Appendix 6684, hopefully that comports with what you all have. But the Beaver reference actually says that 30 to 50 nanograms per milliliter may be adequate and likely that clinical useful serum concentrations would be in the 30 to 50 nanogram per milliliter range. So the notion that Schwid somehow teaches away because it said we need at least 60 nanograms per milliliter, that's just not what the article says. There are also some arguments, especially in the reply brief, that the district court erred because he relied on Pullman for the stable dosing point. Of course, Schwid is a stable non-titrated dose, but the Pullman reference also, which was cited by the district court, involved two sets of patients. And in one set, patients were titrated. But in another set, the patients had participated in a prior study and were told if a dose worked for you, take the dose. That's quoting from Pullman. It's Appendix 6655. So one set of patients in Pullman took one dose. They weren't titrated in this study, and they took it for months. If you remember, what was the dose? It doesn't say except for— Individual patient choice based on past experience? Yeah, so this is a much older reference. Were they recorded? Were they recorded? That is, if there were 17 patients, I don't know the number, 17 patients and 15 said, oh, I did have some prior experience, and they all just used whatever worked for them. Did the researchers find out what that was in each of the 15 cases? Oh, I don't believe the specific doses that the individuals used were recorded, but they said the dose range was 10 to 15 milligrams per day. Per day. Oh, yeah. That's low. No, no, I'm sorry. I misstated. I misstated. 15 to 40 milligrams per day. Okay, so can I take you back to the blocking patent? Absolutely. So here, I guess, is my concern. It seems to me that the district court's reliance on the blocking patent as essentially a neutralizer of what he otherwise found to be some, you know, not quite in the nature of a categorical rule was pretty close to categorical and did not at least discuss what seemed to me product-specific, market-specific facts that tell you whether the absence of somebody else doing this really can be attributed to this blocking patent or not. What do I do? Because it seems to me an absolute rule, categorical rule, just can't be right. It's an empirical question whether the prospect of having to share revenues or losing the race or not defeat the patent leaves you with a sufficient incentive to go down a path to find a solution that if you win, you might well get benefit out of but perhaps have to, you know, pay 60% or something of the revenues. What do I do with that analysis that says there probably isn't a proper categorical rule and I'm not sure I see in the district court's findings very much attention to facts that might tell one whether in this case this is a good explanation for neutralizing otherwise positive objective indicia. Three responses. First, I don't think he applied a categorical rule. We didn't ask him to apply a categorical rule. He said it has, I believe he said, minimal probative value or something to that effect. He said little on that. Yep. Little probative value. He did not apply a categorical rule. Let me try to clarify. I do not mean by categorical rule that it reduced the value of the objective indicia to zero. What I mean by categorical rule is when all I know is there is a blocking patent, all by itself that tells me it significantly weakens has some significant downward valuation effect on commercial success, long-felt need, and failure of others, I guess. And there was other evidence. We had an economist who actually testified about the relevance of the blocking patent to the incentives to a skilled artisan as of the priority date, explained the rationale that is the exact same rationale discussed in the Merck One case. Merck One was before the Supreme Court's decision in Integra, right? In fact, it was. It was January of 2005, and re-hearing was denied in April of 2005, and the Supreme Court decided in June 2005, quite substantially announcing that an enormous amount of research work, including, I gather you agree, clinical studies, is protected from infringement by 271A? It is. Right. So if you're a pharmaceutical company, you can legally do it. It doesn't block you from doing any of that research. The question is, is it worth doing it because you don't get all of such revenue as there is? It's exactly the point. It goes to the incentives. Where are their findings here about whether that set of quite theoretically plausible disincentives would actually have been operative here to explain why Sanofi chose a different product, why Elan walked away from it, et cetera? Well, in addition to the testimony from our economist, which was unrebutted, by the way, Judge Stark did make a finding as to nexus, and the blocking pattern is related to a nexus concept. Commercial success is a way to infer that others tried and failed. That's what the Merck case says. And with regard to nexus, Judge Stark said, As defendants point out, the record does not support a finding that Ampira's success is exclusively attributable to the Accorda patents. For example, Ampira's commercial success is also attributable in part to the drug sustained release formulation claimed in the Elan patent and the 4AP active ingredient disclosed in the prior art. Plaintiffs did not attempt to apportion Ampira's success among its various features. So before this Accorda discovery, let's assume it was that, what was within Elan's formulation had zero economic value. It had a bunch of features, but zero economic value because they couldn't get FDA approval, didn't have evidence that it did anything. They come along and add a new set of limitations, and suddenly it goes from zero value to substantial value. The fact that there were economically valueless components before they came along really discounts the nexus? I disagree that the Elan patent had zero economic value. It did, in fact, right? No, in 1998, there was a license to Accorda. Accorda paid for it. That shows there's value to that patent right there. Since 1998, Accorda was conducting studies. They obviously thought there was value in that Elan patent. Today, the three defendants in this case are enjoined for marketing a generic product because of the Elan patent. So that Elan patent has value, and it had value, and a skilled artisan in 2004 would have been highly disincentivized. If a skilled artisan looked at the Goodman reference and said, wow, it's obvious. I should use a 10-milligram dose. Oh, I can't because Accorda has an exclusive license to a patent that will block me from developing this. Yes, I can do pre-commercial clinical studies, but what good is that if I can't commercialize the product? Yeah, but the answer is it can be good because if they win the race to proving walking improvement before Accorda does and get a patent on it, then Accorda is blocked, and then you have to deal with them. Well, they wouldn't be blocked. Rather, they have to deal with whoever the winner of the race. Well, Accorda wouldn't be blocked because Accorda has an exclusive license to the patent, to the Elan patent. So even if a skilled artisan— If Toronto Pharmaceutical Company won the race to the Accorda discovery before Accorda did and Toronto Pharmaceutical Company got a patent, they would be blocked from doing this. Oh, I see, by the new patent, right. Yes. That's what gives it value. That's why there's going to be a negotiation between a dominant and an improvement patent. But Toronto Pharmaceutical Company would be blocked by the Elan patent until July of this year. Exactly right. The point you're making is they wouldn't, in the real world, do it. They wouldn't go to the enormous expense of doing clinical trials and FDA application unless they had some reason to believe that they could sell it. So if there were going to be a deal, there would have to be a deal before they went to that expense, right? Absolutely, absolutely. How do we know that? Well, we have an economist who offered testimony on that. Did that offer testimony sort of empirical? This was, I think, a question the judge asked Mr. Wexler. In the real world, do companies that see that by stipulation in this question that there is a blocking patent that they're not going to be able to invalidate, do such companies go ahead and make these substantial investments in a product, in the possibility of a product that they would be blocked from marketing in the absence of permission from a blocking patent holder? Or in the real world, do they just not do that? In the real world, pharmaceutical companies do what's called a freedom to operate analysis. They take a look at the patent landscape. They look at what patents are out there. They look at maybe they can work design around some. Maybe there are some that block to a certain period of time, and they say, okay, we'll wait until that date to market. Maybe there are some they think are invalid, and they challenge them. That's what happens in the real world. And in 2004, you had a patent. Number one, you had a patent that doesn't expire until this year and is supporting an injunction in this very case. And number two, you, Skilled Artisan, would know from the Goodman references and Schwinn that Accorda is already developing this product and is further along than you're going to get if you're starting from scratch. And if they get FDA approval, they'll get regulatory exclusivity. So it really would be pointless for a third-party pharmaceutical company to go ahead, read the Goodman reference, say Accorda is developing this product, but maybe I can beat them. Realistically, that's not going to happen, and that's why Judge Stark, when— You know, what you're saying is tremendously plausible, but it's plausible to at least a mind that is not, I guess, versed in the real-world empirics. You're testifying about things that happen in the marketplace, and it sounds plausible, but I don't know if it's true. What in the record tells us whether that's true? Our expert, Dr. Bell, offered testimony from the perspective of an economist— I can't remember if he cited it. I know it's Appendix 963 to 966 for the testimony. I don't—I'm pretty sure that the district court mentioned that Dr. Bell testified. I'm not sure if he specifically cited those pages. But, of course, we do have Merck, Galderma, the Syntex case, where this court has repeatedly remanded to the district court to consider the relevance of a blocking pattern. And so this economic concept we submit has been established by this court's precedent. I see I'm well over my time. I'm happy to address additional questions. Well, let's see if there's anything else that you want to discuss. Anything else for Mr. Klein? Thank you, Mr. Klein. Let's see. Let's see. Let's add—so that's eight minutes for Mr. Wexler. Thank you. Okay, proceed. So I'd like to clarify a few things that were said on my learned adversary's presentation. So with regard to the question about Goodman and the bullets and the basis for finding that there was evidence of efficacy, the question was asked, and you were taken to the two bullets, two separate bullets of Goodman. But what wasn't discussed was the testimony that the court found credible, and that's at page 830, note 11, and 832, where Dr. Goodman explained the bullet and the asterisk. The statement of significance in the bullet was referring only to the 20 to 80 escalating dosing regimen. In the Goodman study, that is the only thing. Why did the district court—could not the district court have said, the question is what would a reasonable person of skill in the art have read this poster to teach? You know, a person of skill in the art does not have Dr. Goodman's testimony when reading this that says it actually means X and not Y. It means something more limited. You're saying that the district court was required to credit the testimony about the meaning of the poster? Dr. Goodman testified about what a poser would understand from the poster, and he pointed to the significance, the asterisk that says significance, only in the 20 to 80 range. He wasn't testifying about anything other than what's reported in the poster. The 20 to 40 is dose response, and Dr. Goodman explained what a—and Dr. Poratka explained what a dose response is. There is nothing in this record, cited by the district court or even pointed to today, that shows without hindsight that 10 milligram has any efficacy. Goodman was an escalating dosing regimen, and there's a real important reason we excluded escalation from our claim, because 4-AP was a drug that people thought required escalation. With regard to Schwitt, we heard counsel's discussion of Schwitt, but if we look at the court's findings on Schwitt, 829, and I submit 829, the court found, with regard to Schwitt at 829, that none of the patients with a CIRM level less than 60 nanogram per milliliter felt better. All patients with CIRM level above 60 nanogram demonstrated improvement in time gait. Right, but what—I mean, why—it sounds like you're equating feeling better with improved walking. That was the measure in Schwitt. It wasn't a pre-specified endpoint that compared—it wasn't a well-controlled study. It was an observational study. This is what the court found about Schwitt, but Schwitt—the district court didn't rely on Schwitt, remember, to say that—the district court relied on Goodman for the idea that the range would be effective. Schwitt is 17.5, twice a day. It's higher than our claim. It can't make obvious the use of a lower dose, and the district court didn't rely upon that. If I could return to the Pullman-Van Diemen, we heard some explanations today. Again, if your honors look at page 827, the district court relied and found about Pullman and Van Diemen. It was a titrating, escalating dosing regimen up to highest tolerable dose based on patient weight, and that's where the stable dose occurred. That's the major confusion with regard to our claim that has stable dosing without titration. And the comments today about what Van Diemen and Pullman show, which are not of record in the district court's findings, those studies also involved IV dosing. They involved immediate release dosing. They had all different paradigms that the district court wasn't talking about and have no relevance. Be very careful about confusion created by that. 827 is where the court's findings on Van Diemen and Pullman are, and they cannot support obviousness of a claim that excludes titration. Long felt need. We didn't hear about that, but I did want to address that. 887, the court found it was convincing and negated that from a blocking patent. There is all the discussion we had about incentives and all that. That is not covered by that. The Merck case, the Lunar News article was a key prior art that was virtually anticipatory, was a publication that gave the idea. Long felt need, there is no basis in the law to negate that, and it was compelling and convincing. The success. We heard a lot of discussion about the success in going to your Honor's questions. Let me just clarify. As a logical matter, long felt need means people recognized we sure needed something, and it's long felt because nobody figured out how to provide that. Why would a blocking patent not be relevant to that? Because a blocking patent, whatever effect it has, it provides some, maybe even decisive real-world effect in deterring people from going to try to find that. I would submit the answer to that is no, because in the Merck case, the Lunar News article, which was the anticipatory reference, virtually anticipatory, was published in the face of Merck's earlier FDA exclusivity, and the court explains that in Hospira, that an idea, in other words, if someone proposed even this as an idea, remember, long felt need is a 102-year-old compound. It's a check on us looking back and saying this is simple. This is a difficult compound for AP. The toxicity of potassium channel blocking is tied to the mechanism. That's why people escalated. Schwid looked at the mean serum levels and said we need 60 or higher, but there are, Van Diemen and Pullman, they titrated, Goodman, escalated, and his significance was 20 to 80 and only that, and the court found that the individual doses were not significant over placebo. It is only through hindsight. I'm not sure that I fully understand the titrate point, because if there's efficacy, if it works at 10 milligrams and there is plenty of teaching that there are toxicity risks with respect to this compound, why doesn't that teach to use the lowest dose that would work? And that's exactly, you know, think about that. Now we're using hindsight. If it was that simple, if it was that simple, everybody knows it's a toxic compound. Take the lowest dose. Make it work. Why? Why did Van Diemen and Pullman, why did they titrate? I don't think you're really answering my question. Because it's not that simple. The lowest dose was not effective. Placebo did better. But if the lowest dose is effective, one would use the lowest dose because of the toxicity concerns, right? And that's the invention here. We discovered that the lowest dose was effective, and we could abandon escalating patients up to acclimate them to a dose. That was our discovery. And only in hindsight does it seem that simple. In the Disha court at A72 to A73, that was the premise of its finding, and it was based on the dose response curve. And, Your Honor, with regard to the success point, at A82, the Disha court rejects, analyzes and rejects the defendant's argument about that we should have apportioned to all the different stages of risk. He does a detailed analysis rejecting what you heard. And the reason is because we first went after spinal cord injury. We first licensed the patent for spinal cord injury. So it wasn't, you know, there were different stages along the way. And a court had kept, you know, took blows and kept going. So the court found nexus, found considerable evidence of long-felt need, found convincing evidence, and found failures of others. Of Elan, who abandoned its trial, the Schwitt study, and Sanofi, who avoided 4-AP because of the safety problems with that compound. Sanofi and Ventus looked to a different compound that had sodium and potassium channel blocking, and that's in the record. And we cited in our briefs, Sanofi went away from 4-AP because it was dangerous. And that danger was the same thing that drove the consistent use of titration. We submit that if Your Honors look at 72 to 73, you'll see that is the fundamental place where the Disha court cites defendant's argument and testimony that doesn't say what the court says. And that becomes the launching point for the mistaken assumption that a dose response curve implies that it's better than placebo. We have a claim here that requires no titration. We were the first and only people to bring 4-AP to market to treat a condition that had never been before approved by the FDA. The amicus have come in and said that the denigration of the objective indicia is a problem for improvement patents because in that situation, theoretically, improvement patents would be subject to lesser standards under Graham v. John Deere because they're within some earlier patent. That isn't the law and it has never been the law. This is the essence of what the patent law incentivizes. And we respectfully request that the judgment of the court that it was obvious be reversed. Okay. Any more questions? Thank you, Your Honor. No questions? Okay, thank you. Thank you both. The case is taken under submission.